**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Eugene C. FOSHEE and Wheeler G.**
**Foshee, Jr., Defendants-Appellants.**

**No. 76–3435.**

United States Court of Appeals,
Fifth Circuit.

March 10, 1978.

Frank J. Tipler, Jr., W. Sidney Fuller, Andalusia, Ala., Thomas R. Elliott, Jr., James E. Clark, Birmingham, Ala., for defendants-appellants.

Barry E. Teague, U. S. Atty., D. Broward Segrest, Asst. U. S. Atty., Montgomery, Ala., for plaintiff-appellee.

Before BROWN, Chief Judge, COLEMAN and TJOFLAT, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Two members of a prominent Alabama farming family, one a state legislator at the time in question, appeal their convictions for mail fraud. 18 U.S.C.A. § 1341.[1] We reverse and remand for a new trial because of an unwarranted objection sustained by the trial court during the Foshees' closing argument.

The Foshees operated a farm of 2,000 acres, a farm supply company, and a milling company, and engaged in various other agricultural enterprises. It was a large business which at peak times of the year required a tremendous cash flow. They had extensive credit arrangements with several area banks and were generally regarded as good customers. Their problems began after a series of bad crops and natural disasters caused financial setbacks.

Prior to 1974, the Foshees had maintained their business accounts with two banks. In 1974, they opened accounts in four other banks. The indictment charges that beginning on December 19, 1974, and continuing until January 21, 1975, and beginning on February 10, 1975, and continuing until March 20, 1975, they made a series of deposits and withdrawals, knowing that there were not and would not be sufficient funds in the accounts of the drawee banks to cover the checks, other than floating funds created by the rapid succession of other checks which the Foshees knew or should have known were also insufficient fund checks. In short, the charge was that the Foshees were operating a check kiting scheme, which rises to the level of a federal offense when the United States mails are used. *E. g., United States v. Johnston,* 5 Cir., 1977, 547 F.2d 282; *United States v. Shepherd,* 5 Cir., 1975, 511 F.2d 119.

The total potential loss to all six banks was approximately $289,000.00. But the interesting twist to this case is that none of the six banks lost any money on this alleged scheme. The checks were all paid back before any bank complained to the Foshees and prior to the time the defendants were notified of the check kiting investigation. Testimony also indicated that the Foshees had made large overdrafts in the past on which the banks often charged interest as if the overdrafts were regular loans. Some of the banks even had letters of authority to apply funds from various accounts of the Foshees as the money was needed.

### Intent To Defraud

The Foshees allege several grounds for error. The one on which we reverse resulted from an objection to the closing argument of the defendants' counsel. The argument emphasized that the drafts had been paid and that the banks lost no money:

[Defense counsel] And the bankers, themselves, don't complain one iota. They are still their customers. They are

---

1. The statute provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

still their friends. They have been paid every cent, and they are going to be paid every other cent owing. The bankers knew it better than anybody, because they are experienced in this sort of thing—run it and know it. Now, he said look at this. Look at where it says that it's to defraud. Now, to defraud somebody—to defraud is to cheat; and before you can defraud, and before you can cheat, somebody has to be defrauded, and somebody has to be cheated, and before you can intend—

MR. SEGREST [Government attorney]: We object to that.

MR. TIPLER: —and intend to defraud—

MR. SEGREST: We object to that.

THE COURT: The objection is well taken. I will charge you fuller when I charge you on the law of the case that the success or failure of a scheme to defraud is *immaterial,* so it is not necessary that someone be actually cheated in the case. And the argument is improper, and the argument—the objection is sustained. [Emphasis added.]

R., vol. 3, at 442.

█ The success of a scheme to defraud, of course, is not a requirement for a § 1341 violation. *Adjmi v. United States,* 5 Cir., 1965, 346 F.2d 654, 657; *Kreuter v. United States,* 5 Cir., 1955, 218 F.2d 532, 535. But specific intent to defraud is an essential element of the crime. *Coleman v. United States,* 5 Cir., 1948, 167 F.2d 837, 839. The principal defense of the Foshees was that they did not have the requisite intent.[2]

█ In determining intent, it is clear that the jury may consider that the banks were not defrauded since they suffered no financial loss. *See, e. g., United States v.*

*Gross,* 8 Cir., 1969, 416 F.2d 1205, 1212; *Williams v. United States,* 9 Cir., 1960, 278 F.2d 535, 537. As the Seventh Circuit stated in *United States v. Meyer,* 7 Cir., 1966, 359 F.2d 837, 839–40, *cert. denied,* 385 U.S. 837, 87 S.Ct. 85, 17 L.Ed.2d 71:

> The success of a scheme to defraud is not an element of the crime, although it may reflect the defendant's fraudulent intent. Similarly, the failure to benefit from a scheme does not necessarily indicate innocence, although it may mirror the defendant's good faith.

To prove their good faith, the Foshees offered testimony to the effect that no bank complained of a loss and that the drafts were all paid, as well as on what the Foshees thought were customary banking practices.

In jury argument, therefore, we believe the Foshees had a right to urge that the banks did not lose any money. The untutored, unthought reflex objection by government counsel should have been overruled. Defense counsel was trying to persuade the jury that a person who saw to it that the drafts were all paid could hardly harbor the critical intent to defraud. The trial court, unfortunately, compounded the error by instructing the jury that the "success or failure of a scheme to defraud is immaterial," without an accompanying admonition that it was relevant to the issue of intent.

We realize that the distinction between saying that the success of a scheme is not an element of the crime but that it is relevant to the issue of intent is narrow and can be confusing for a jury, as well as for a judge. Nevertheless, the trial court's comment, "which under some circumstances would not be ground for reversal, cannot be brushed aside as immaterial since there is a

---

2. As an analogy, the general rule is that fraudulent intent is negated by proof one had a reasonable expectation that deposits would cover the check at the time it was presented for payment. *United States v. Bessesen,* 7 Cir., 1971, 445 F.2d 463, 467, *cert. denied,* 404 U.S. 984, 92 S.Ct. 448, 30 L.Ed.2d 368; *United*

*States v. Gross,* 8 Cir., 1969, 416 F.2d 1205, 1212; *Williams v. United States,* 9 Cir., 1960, 278 F.2d 535, 537; *United States v. Broxmeyer,* 2 Cir., 1951, 192 F.2d 230, 232–33. *See also* Annot., *Reasonable Expectation of Payment as Affecting Offense under "Worthless Check" Statutes,* 9 A.L.R.3d 719.

real chance that it might have provided the slight impetus which swung the scales toward guilt," *Glasser v. United States*, 1941, 315 U.S. 60, 67, 62 S.Ct. 457, 463–64, 86 L.Ed. 680, 689. In this case, especially, in which intent was the main issue, the Judge should have been more careful to insure that the defendants' theory of defense was not short-circuited by a misleading, though probably inadvertent, instruction.[3]

Indeed, the Judge's formal charge[4] demonstrates that his stated reason for cutting

3. *Cf. United States v. Riley*, 5 Cir., 1977, 550 F.2d 233 (conviction for misapplication of bank funds under 18 U.S.C.A. § 656 reversed because evidence of intent to defraud excluded).

4. The instructions concerning intent and good faith were as follows:

> To act with intent to defraud means to act knowingly and with a specific intent to deceive, ordinarily for the purpose of either causing some financial loss to another or bringing about some financial gain to one's self.
>
> \* \* \* \* \* \*
>
> The success or failure of the scheme, if all the other elements are present, is not essential to . . . completion of the offense of mail fraud. Fraudulent intent, however, is a necessary element. The law says that fraudulent intent may be inferred from a series of seemingly isolated acts if they are sufficiently numerous, even though each act standing by itself may not appear important. The mailing must be an integral part of the execution of the fraud and must be incident to an essential part of the scheme. Further on the mail fraud definition and explanations: I charge you that presentation of a check to a bank for deposit to one's checking account is an implied representation to that bank that there are sufficient funds in the bank on which the check is drawn to cover the check or that the one who presents the check has a reasonably certain belief that funds will be in the distant bank when the check is there presented; however, the fact that the banks may not ultimately lose money does not erase the scheme to defraud if it originally existed. The scheme and its activation does not have to be successful in order to qualify as a crime under the mail fraud statute, as I have defined that statute for you.
>
> One of the primary issues in this case is whether the defendants acted in good faith; and on this issue, the law says you may consider evidence of disclosure to the postal authorities as the evidence may reflect was made by one or more of the defendants during the investigation in this case. I charge you that you may consider evidence on the issue of good faith as to whether the fact the defendants had reason to believe that legitimate sources of income or funds possessed or anticipated by them would suffice to make the checks good. That doesn't mean that making them good eliminates the crime if a crime was previously committed; that is admissible and you may consider it and you should consider it on the issue of good faith and intent to defraud, which insofar as this charge is concerned are synonymous.

R., vol. 3, at 479–82. After two hours of deliberation, the jury received supplemental instructions on the definition of "intent to defraud":

> THE COURT: You will notice that each of the acts charged in this indictment charges that the defendants—and you will determine guilt or innocence separately, as I told you before—charges that the act was done with intent to defraud. To act with intent to defraud means to act knowingly and with the specific intent to deceive, for the purpose of either causing some financial loss to another or bringing about some financial gain to one's self.
>
> JUROR MILES L. VAUGHAN: Thank you, Your Honor.
>
> THE COURT: Just a minute.
>
> SECOND JUROR: May I speak with him for a moment?
>
> THE COURT: Yes.
>
> (Second juror conferred privately with Juror Vaughan)
>
> JUROR MILES L. VAUGHAN: Your Honor, there is also a question as to whether we are to vote on the intent to defraud or whether we are to vote on guilty of check kiting, anything of that nature.
>
> THE COURT: All right; as I told you when I charged you, in this case there are certain elements involved in each of the offenses charged. These elements are—and I'll go back over them with you: First element is the act or acts of having devised or intending to devise a scheme or artifice to defraud or to attempt to defraud—or to attempt to defraud, is one element. Second element in each offense charges the act or acts of placing or causing to be placed in a depository for mail matter a letter intended to be sent or delivered by the Post Office Department as charged. And third element in each count is the act or acts of so using the mails willfully and with the specific intent to execute or carry out the scheme or artifice to defraud or attempt to do so. Those are the elements; and when you vote on guilt, you vote on all of that at the same time. The burden is on the Government to prove each of those elements as to each charge. If they do it and do it beyond a reasonable doubt, then you will return a verdict of guilty. If they fail to do it as to either element or they fail to do it as to all the elements beyond a reasonable doubt, return a verdict of not guilty. Do you have any other question?

off argument, that the scheme's lack of success was "immaterial," was clearly wrong. If, as the Judge instinctively stated, it was "immaterial," then it could serve no purpose and would have no possible bearing on the jury deliberations or decision. But in later instructions, the scheme's lack of success was frankly recognized as bearing on "good faith" or "intent," which the Judge treated as synonymous. In the setting of this case these later instructions could not cure the immediate, prejudicial impact of the unadorned statement that lack of success was immaterial. The abbreviated charge in the midst of closing argument was too damaging to remedy.[5]

Unlike the usual situation in which, considering the charge as a whole, an incorrect statement of law by a judge is rendered harmless by a later correct instruction, the prejudice here was irretrievable, not because the Judge gave a wrong reason which he later corrected, but because the Judge sustained the government's ill-founded objection. No matter how correct the Judge's later formal charge, the ruling cut off argument to the jury, not on the fact of no loss through repayment, but on how or in what manner the proof showing no financial loss was a reliable indicator that these actors did not intend, as the statute demands, to defraud the banks. Of course, to defraud is to cheat. And it was this argument the trial judge ruled could not be made. How persuasive that rationale might have been no one knows nor ever can. But certainly we cannot declare that for this purpose, which the Court's formal charge recognized as legitimate, counsel's argument would have been fruitless.

Because of the erroneous limitation on jury argument the cause must be reversed and remanded for a new trial.

### Other Complaints

The Foshees also make two other significant assertions of improper trial court comment. They argue that the Judge erred in mentioning a probation-presentence report to the jury when he sustained an objection to defense counsel's remark that the Foshees might be sent to the "federal penitentiary.[6]" Since this particular remark is not likely to recur, we need not pass on it now. Likewise, we need not reach the contention that the trial judge made coercive comments to the jury when at first it was unable to reach a verdict.[7] We mention

---

JUROR MILES L. VAUGHAN: That's all. R., vol. 3, at 491–93.

5. *Cf. United States v. Garber*, 5 Cir., 1972, 471 F.2d 212, 217 (prosecution's remarks in closing argument not cured by final instructions); *Mora v. United States*, 5 Cir., 1951, 190 F.2d 749, 752 (error in admitting confession not cured by final instructions).

6. The comments in question occurred during the closing argument of Mr. Tipler, the defendants' counsel:

Is that any reason to condemn them? People are people, and people have wives, and people have children, and people suffer, and people don't like to be mistreated. And to say that these boys should be subjected to the federal penitentiary—

MR. DE MENT [Government attorney]: We object.

MR. TIPLER: —for doing nothing else than this—

THE COURT: Objection is well taken. You jurors, let me say this: As to what punishment may be ultimately imposed in this case as to either defendant in the event there is a verdict of guilty as to either of them is not a proper argument, because that is not a function of the jury. You will be required to find guilt or innocence. Punishment, in the event you find guilt as to either of them, will ultimately be decided after an appropriate probation-presentence report and study and evaluation and consideration of that. And so it's improper for a lawyer to argue that if you convict, they will be sent to the federal penitentiary—

MR. TIPLER: I didn't say that, sir; I am sorry.

THE COURT: —and the objection is sustained.

R., vol. 3, at 440–41.

7. The first allegedly coercive comment occurred following supplemental instructions:

THE COURT: The Court cannot help you determine these facts. You are sitting where a Judge sits when he decides lawsuits, and sometimes your seat gets hot; but you decide them according to your oath. Go back in the jury room.

R., vol. 3, at 493. Later, when the jury said it was unable to reach a verdict, the Court stated:

THE COURT: In response to that, I say this to you; that it is much too early in this case to conclude that you cannot reach a

this only to highlight our experience that the risk of reversal is always great when a judge varies one jot or tittle from the standard *Allen* charge. *E. g., United States v. Amaya*, 5 Cir., 1975, 509 F.2d 8.

■ The probable recurrence of one remaining issue, however, compels us to consider it briefly. The Foshees contend that the government did not establish the use of the mails, one of the essential elements of a § 1341 conviction. Although the jury might have concluded that the Foshees did not have the requisite intent to defraud, we think ample proof exists that they used the mails or caused them to be used.

■■ The government is not required to show that the Foshees themselves placed the matter in a mail depository. All that need be proved is that they caused the mails to be used and that the mailings were sufficiently related to the alleged scheme. *United States v. Maze*, 1974, 414 U.S. 395, 399, 94 S.Ct. 645, 38 L.Ed.2d 603, 608. Moreover, the law is settled in this Circuit that mail use is related to a check kiting operation if the banks use the mails to clear checks with correspondent banks in other cities. *United States v. Johnston*, 5 Cir., 1977, 547 F.2d 282, 283–84; *United States v. Shepherd*, 5 Cir., 1975, 511 F.2d 119, 120–22; *United States v. Constant*, 5 Cir., 1974, 501 F.2d 1284, 1290–91. The greater the delay in the mails as the checks are being cleared, the greater will be the forced credit obtained as a result of the collection process. Thus, use of the mails is an integral part of any check kiting operation. In this case, as in the others, the government proved that the banks used the mails to clear checks. This is sufficient to relate the alleged scheme to a § 1341 violation.

REVERSED and REMANDED.

verdict, and you will be required to continue your deliberation. The Marshal has made arrangements for a place to escort you to lunch. It's necessary to keep you together, and you will be kept together, from the commencement of your deliberations until the conclusion of your deliberations. So while you are out of the jury room, you should not deliberate the case. Reconvene when you finish your lunch. The Marshal will escort you back to the jury room, and then recom- mence your deliberations, and let me know when you have reached your verdict.
    JUROR MILES L. VAUGHAN: Thank you.
    (One juror started toward jury room)
    THE COURT: Just a minute, please; don't separate my jury.
    JUROR: She's got to get her purse.
    THE COURT: That doesn't make any difference; the Marshals are charged with the responsibility of not separating the jury.
R., vol. 3, at 494–95.