UNITED STATES of America, Plaintiff-Appellee,

v.

Eugene C. FOSHEE and Wheeler G. Foshee, Jr., Defendants-Appellants.

No. 76–3435.

United States Court of Appeals, Fifth Circuit.

Aug. 21, 1978.

Frank J. Tipler, Jr., W. Sidney Fuller, Andalusia, Ala., Thomas R. Elliott, Jr., James E. Clark, Birmingham, Ala., for defendants-appellants.

Barry E. Teague, U. S. Atty., D. Broward Segrest, Asst. U. S. Atty., Montgomery, Ala., for plaintiff-appellee.

ON PETITION FOR REHEARING

(Opinion March 10, 1978, 5 Cir., 1978, 569 F.2d 401).

Before BROWN, Chief Judge, COLEMAN and TJOFLAT, Circuit Judges.

PER CURIAM:

Although it does not change the holding in the case, we amend our opinion that appears at 569 F.2d 401, in response to the Government's Petition for Rehearing, by withdrawing the fourth paragraph on page 402 and substituting the following:

The total potential loss to all six banks on the checks written by the Foshees was approximately $289,000.00. But the interesting twist to this case is that bank officials testified that the checks were paid and that the banks suffered no financial loss.[1] R., vol. 2, at 52, 76, 96, 125–26, 148, and 172. Several checks were paid in the last week in March, and all, except for about $25,000 worth, were paid by April 7. About one-half the remaining amount was paid on May 17, and the final overdraft was covered on October 14, 1975.[2] R., vol. 3, at 322–23, 334–44.

The postal authorities initiated their investigation on May 14, 1975. Defendant E. C. (Crum) Foshee testified that he was advised of the alleged check kiting for the first time in the last week of June when he was called for questioning by the post office officials. Wheeler Foshee, the other defendant, was not called for

---

1. Although the checks were paid, a state bank examiner said that a loss still occurred because the banks could have been paid interest for the "unauthorized loans" occurring as a result of the alleged check kite. R., vol. 3, at 294–95. Bank officials however, specifically stated to the jury that the banks lost no money.

2. The defendants persuasively demonstrate that the overdraft paid on October 14, 1975, was akin to a regular loan. An insufficient funds check had been written on an account in the Bank of Brewton, but instead of returning the check, the bank chose to process it as an overdraft on April 10. The bank charged interest just like a loan. In fact, the Executive Vice President of the Bank of Brewton indicated that the bank was willing to hold the overdraft because the Foshees had an outstanding loan with the bank secured for $100,000 more than the amount of the loan itself. And he had "authority to apply anything that comes in or goes out to an existing note. . . ." R., vol. 2, at 101.

an interview until several months later. Crum Foshee contends, moreover, that none of the six banks at any time complained to him about the possibility of a check kiting scheme. R., vol. 3, at 401.

Wheeler Foshee, on the other hand, was told by one bank president in February or March 1975 that he "suspected a kite" and that he "wasn't going to pay his checks any more on this account." R., vol. 2, at 119–20. Foshee asked the official what was a "kite," and he was told simply that it was "drawing on uncollected funds," *id.* at 121, which arguably could mean something different than a full-fledged check kiting scheme.

In the last week in March, furthermore, Richard Doughty, a state bank examiner, investigated the possibility of check kiting at several banks where the Foshees had accounts. Doughty said that he "indicated" to the banks that he thought a "kite was going on." R., vol. 3, at 275. Doughty, however, did not state exactly when he notified the banks. He also admitted that he never talked to the Foshees about the kite, *id.* at 340, and that he did not know when anyone first told them that a kite was suspected. *Id.* at 341. Other than the one bank president already mentioned, no banker testified when the Foshees were notified of the alleged kite.

Evidence during trial also revealed an interesting picture of the banking practices with which the Foshees were familiar. The Executive Vice-President of the Bank of Brewton, for example, testified that "it is our practice to let people draw against uncollected funds." R., vol. 2, at 100. The President of the Citizens National Bank of Opp explained that a note on a loan outstanding to the Foshees allowed the bank to "hold that security against any other indebtedness that the Foshees may incur against [the] bank." *Id.* at 146. The President and Chairman of the Board of the Conecuh County Bank of Evergreen stated in a letter that "for a number of years [the Foshees] used this bank as their major operating account, and at times this account would show overdrafts which were always covered and was to be expected in a large operation as was the case of the Foshees. Our dealings with the Foshees have been satisfactory in every respect, and they have always done just what they said they would do . . . We have never lost any money on any checks or other transactions with the Foshee boys." *Id.* at 175. The Foshees, in particular, had an arrangement with the Conecuh County Bank whereby their cotton gin account could be overdrawn during cotton ginning season and the bank would charge them interest. Although it was not a written loan agreement, the Foshees would apply their cotton receipts as collateral for the overdrafts. *Id.* at 167–71.

██ Our opinion does not hold, as the Government contends, that reimbursement or restitution absolves one from the crime of check kiting. Neither do we hold that reimbursement is the same as having a reasonable expectation that deposits would cover the checks at the time they would be presented for payment.[3] Neither do we

---

**3.** Interestingly enough, since no federal statute explicitly makes the kiting of checks a crime, the mail fraud charge draws on many non-federal statutory sources. For example, the Alabama Worthless Check Act exempts a person from criminal liability for check kiting if the drawer has "enough credit with the depository. . . ." Ala.Code tit. 14, § 234(12). The pertinent sections of tit. 14 are as follows:

§ 234(9). **Intent of the legislature.**—It is the purpose of this act to provide a remedy for the evil of giving checks on a depository without first providing sufficient funds or credit in such depository to pay the checks on presentment after the payment date written on the check. Also, it is the purpose of this act to remedy the situation where a check is given on a nonexistent depository or on one where the drawer has no account. Such present activity tends to create the circulation of worthless checks on banks, bad banking, check kiting, and a mischief to trade and commerce.

\* \* \* \* \* \*

\* \* \* \* \* \*

§ 234(12). **Issuing a check without sufficient funds or credit.**—It shall be unlawful for any person to draw a check, or to cause or direct the drawing of a check, with intent to defraud, on any depository knowing at the

disparage cases by us and others which hold that in a kiting arrangement the government has established the crime by proving that at the time of issuance of the check the issuer had no reasonable expectation that on presentment the check would be honored.[4] Nor do we break new ground on what evidence is or is not admissible to prove intent in a check kiting case. The trial judge admitted testimony that the checks were paid and the banks suffered no loss. Indeed, he instructed the jury in his final charge that such evidence should be considered on the issue of good faith and intent to defraud.[5] The payment of the checks was simply one factor the jury could weigh to determine what was the reasonable expectation of the defendants. What we hold, and all that we hold, is that the fact of payment within virtually one week's time of the Alabama bank examiner's discovery of the practice, was, as the District Court so plainly and correctly held, admissible on the question of the issuer's intent to defraud. For the trial judge, thereafter, to have ruled peremptorily as he did that it was not necessary for the Government to prove that the defendants actually cheated unduly restricted their right to full argument. To defraud is, in less nice language, to cheat.

Nonetheless, despite our limited holding, the Government maintains that the only reason the Foshees paid the checks was because they were aware of the check kiting investigation. Thus, it had no bearing on the Foshees intent to defraud when the checks were written. Payment was only an afterthought. But this is merely a jury argument, not a legal one.[6] See United States v. Riley, 5 Cir., 1977, 550 F.2d 233, 237. The record is unclear on exactly how much the Foshees knew about the kiting investigation when they paid the checks. Crum Foshee, for example, specifically denied any knowledge about check kiting prior to payment of the checks.[7] Therefore, when Foshees' counsel was cut off in closing argument, whether the checks were paid without knowledge of any kiting suspicions was a question for the jury to decide.

The Government's argument not only disregards the trial court's actual rulings because the evidence of payment was admitted as relevant, it also ignores this Court's "liberal policy as to the admission of evidence tending to prove good or bad faith . . ." in mail fraud cases. United States v. Diamond, 5 Cir., 1970, 430 F.2d 688, 692. This policy exists because specific intent to defraud, which is a prerequisite for a check kiting conviction, can be difficult to prove. A defendant can testify on his intent, which was done in this case, but more often circumstantial evidence must be introduced to allow the jury to infer intent. Consequently, courts are given considerable leeway in determining what evidence is admissible, as the Second Circuit has explained:

> [S]ince [intent] may be only inferentially proven, 2 Wigmore on Evidence §§ 300, 302, 3d Ed. 1940, no events or actions which bear even remotely on its probability should be withdrawn from the jury

4. See cases cited at 569 F.2d at 403 n. 2.

5. The trial judge expressly considered good faith and lack of intent to defraud as "synonymous." 569 F.2d at 404 n. 4.

6. The Government, in fact, admits that "subsequent restitution . . . technically [has a] bearing on the defendants intent," but it is a "very weak defense." Petition for Rehearing at 37.

7. Since Crum Foshee was charged with mail fraud through check kiting, "evidence of his intent by direct testimony on his part as to his belief and motive was material; such evidence if believed by the jury might tend to repel the inferences of fraudulent intent revealed by his activities." United States v. Kyle, 2 Cir., 1958, 257 F.2d 559, 563. See also Deschenes v. United States, 10 Cir., 1955, 224 F.2d 688, 692.

unless the tangential and confusing elements interjected by such evidence clearly outweigh any relevancy it might have. *United States v. Brandt*, 2 Cir., 1952, 196 F.2d 653, 657.

In other check kiting cases, evidence was before the jury, as in this prosecution, that the checks eventually were made good and no bank suffered a loss. *See Williams v. United States*, 9 Cir., 1960, 278 F.2d 535, 537; *United States v. Gross*, 8 Cir., 1969, 416 F.2d 1205, 1212. Furthermore, in *United States v. Constant*, 5 Cir., 1974, 501 F.2d 1284, this Court implicitly stated what is relevant to prove intent in a check kiting case:

His only defense was that he intended to make the checks good at some later time, and he did not introduce any other evidence of later attempts to cover the checks or of any amounts owing to him from third parties or any other resources from which he could have covered the checks.

*Id.* at 1289. The Foshees, in contrast, introduced evidence that they paid the checks and that they believed they had resources from which they could cover the checks.

■ Under the test of reasonable expectation to pay the checks when presented, the Foshees, conceivably, could have never paid the checks, yet be acquitted if the jury believed they had a reasonable expectation of payment when the checks were written. If the checks were never paid, however, and the banks lost money, the Government, no doubt, would introduce this evidence and argue that it proves intent to defraud. E. g., *United States v. Regent Office Supplying Co.*, 2 Cir., 1970, 421 F.2d 1174, 1181 ("proof that some one was actually victimized by the fraud is good evidence of the schemer's intent").[8] Surely the defendants

have just as much right to argue that payment of the checks related to their intent. *Cf. Shale v. United States*, 5 Cir., 1968, 388 F.2d 616, 618, *cert. denied*, 393 U.S. 984, 89 S.Ct. 456, 21 L.Ed. 445 (cooperation of defendant with postal authorities during investigation was a factor the jury considered to determine good faith).

From the defendants' standpoint, payment of the checks would lend credibility to a claim that they had an expectation to pay all along. Thus, even if the Foshees were aware of the check kiting investigation when they paid the checks, the jury might still infer that when the checks were originally drawn, the Foshees expected that funds would be on hand when presentment occurred or that they intended to have the credit to pay the drafts from drawee bank advances without injury to anyone.

■ The jury, of course, could easily reject these inferences. They could believe that the payments were a mere sham or a cover-up. Nonetheless, "[t]he court must entrust to the jury the task of sifting the evidence and the ability to reach a reasonable conclusion upon the question of intent to defraud." *United States v. Diamond, supra.* But the Court must first allow reasonable argument on the evidence. Since the testimony on payment "went directly to the question of intent . . . it follows that it was admissible and that the *argument thereon was not improper.*" *Temple v. United States*, 5 Cir., 1964, 330 F.2d 724, 725, *cert. denied*, 379 U.S. 831, 85 S.Ct. 61, 13 L.Ed.2d 39 (emphasis added). In a check kiting prosecution, for example, Judge (now Justice) Blackmun explained *that defense counsel "stressed to the jury and at oral argument . . . that no one 'lost one penny' by the actions of the defendants . . . ."* *United States v. Gross*, 8 Cir., 1969, 416 F.2d 1205, 1209 (emphasis added).

**8.** See *Farrell v. United States*, 9 Cir., 1963, 321 F.2d 409, 419. *Cf. United States v. Belt*, 5 Cir., 1978, 574 F.2d 1234, 1238 n. 17 (proof of specific intent to defraud labor union under 29 U.S. C.A. § 501(c)). A recent student comment explains:

Courts recognize that fraudulent intent is difficult to prove because it is subjective. Consequently, they have developed . . . rules to facilitate its proof. One rule is that

the prosecutor may prove fraudulent intent by circumstantial evidence. This rule is often expressed by reference to the "badges" of fraud. For example, courts have held that proof that a victim actually lost money or property *is strong evidence of the offender's* fraudulent intent.

Comment, *Survey of the Law of Mail Fraud*, 1975 Ill.L.Forum 237, 242 (footnotes omitted).

Although the defendants were convicted in *Gross*, they had the opportunity to make their "no loss" argument before the jury.

Our concern for whether the defendants argued to the jury the evidence on intent is not an idle fancy. It must be remembered that the burden is on the Government to prove beyond a reasonable doubt that the defendants had the specific intent to defraud. We have stated before that in mail fraud cases proof of intent is "paramount . . . because the good faith of a defendant . . . is ordinarily a complete defense." *Coleman v. United States*, 5 Cir., 1948, 167 F.2d 837, 839. Indeed, "often the only available defense is that of good faith." *United States v. Diamond, supra.* The Foshees, therefore, should be given a full opportunity on remand to use what evidence was admitted, circumstantial as it may be, to argue that they acted in good faith without the intent to defraud.

In all other respects the Petition for Rehearing is Denied, and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is Denied.