UNITED STATES of America, Appellee,

v.

Michael D. BISHOP, Appellant.

UNITED STATES of America, Appellee,

v.

Bennett L. LITTLE, Appellant.

UNITED STATES of America, Appellee,

v.

Robert E. LARSON, Appellant.

Nos. 86–5372, 86–5462 and 86–5463.

United States Court of Appeals,
Eighth Circuit.

Submitted May 13, 1987.

Decided Aug. 13, 1987.

Rehearing Denied in No. 86–5463
Sept. 10, 1987.

Rehearing Denied in Nos. 86–5372 and
86–5462 Sept. 15, 1987.

B.J. Rothbaum, Oklahoma City, Okl., for appellant.

Charles S. Miller, Jr., Asst. U.S. Atty., Bismarck, N.D., for appellee.

Before HEANEY, BOWMAN and MAGILL, Circuit Judges.

HEANEY, Circuit Judge.

Bennett Little, Robert Larson, and Michael Bishop were convicted in a jury trial of mail fraud, wire fraud, and conspiracy pursuant to 18 U.S.C. §§ 1341, 1343, 371 and 2.[1] Little was sentenced to six months of incarceration and placed on probation for five years subject to his making restitution to the lending institutions jointly and severally with Larson in the amount of $18,000 and fulfilling 500 hours of public service. Larson was sentenced to three months of incarceration and placed on probation for five years subject to making restitution and contributing 250 hours of public service. Bishop was sentenced to five years of probation on the condition that he make restitution in the sum of $6,500 to the Farmers Home Administration (FmHA). Little, Larson and Bishop appeal from the verdict. We affirm.

## I. BACKGROUND.

The indictment charged that the defendants engaged in a scheme to defraud lending institutions of their interests in mortgaged cattle. The scheme, essentially, was that the defendants counseled financially distressed farmers and ranchers to sell their cattle, which were subject to the lender liens, to the defendants at a below market price. To induce these sales, the defendants promised the farmers that either they would be able to share in the profits when the cattle were later resold or that they would be able to buy back the cattle free of the mortgage liens at a below market price.

Further, the indictment charged that the defendants counseled the farmers to make false representations to the lending institutions in order to induce the lenders to accept the below market price and release the liens. With instructions from the defend-

---

1. The jury found a fourth defendant, Allen Larson, guilty of only one count of fraud. The district court granted Allen Larson's post-trial motion for judgment of acquittal.

ants, the farmers then misrepresented to the lenders the kind and number of cattle sold, the condition of the cattle, and the going rate for similar cattle. Finally, the defendants would then move the cattle to remote and undisclosed locations in an attempt to force the lenders to accept satisfaction of the mortgage liens on the cattle sold.

In this appeal, Little, Larson, and Bishop claim that 1) their conduct did not constitute a crime, 2) the evidence was insufficient to support their convictions, 3) the trial court erred in its instructions to the jury, and 4) they were denied effective assistance of counsel.[2] Larson alone claims that he should have been granted a new trial on the basis of newly discovered exculpatory evidence. Bishop alone claims that the trial court abdicated its duty to decide questions of law by allowing this case to go to the jury when the court believed that the facts could not constitute criminal behavior. We reject each of these contentions.

## II. DISCUSSION.

### A. Failure to Commit a Crime.

■ The defendants first contend that their conduct simply did not amount to fraud under the federal mail and wire fraud statutes and that they merely aided the farmers in "hard bargaining" with private and governmental lenders. While we agree, as the trial court held, that mere advocacy of or engagement in "hard bargaining" violates no law, the record reflects that the scheme for which the defendants were indicted involved much more than "hard bargaining." As noted, the indictment charged that the defendants participated in a scheme to misrepresent to lenders the value of the cattle sold, the numbers of the cattle sold, and the going rate for cattle; to counsel and assist in the removal of secured collateral; and to promise the farmers additional consideration in the form of either shared profits from the resale of the cattle or the opportunity to repurchase the cattle at a price below market value.

This scheme, together with defendants' alleged purpose of depriving the lenders of money or a tangible property interest, falls well within the provisions of the mail and wire fraud statutes. We have held that the fraud requirement of the mail fraud statute is to be construed more broadly than common law fraud, *see United States v. McNeive*, 536 F.2d 1245, 1247–50 (8th Cir. 1976), and that

> [t]he crime of mail fraud is broad in scope. * * * The fraudulent aspect of the scheme to "defraud" is measured by a nontechnical standard. * * * Law puts its imprimatur on the accepted moral standards and condemns conduct which fails to match the "reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of the members of society." This is indeed broad. For as Judge Holmes once observed, "[t]he law does not define fraud; it needs no definition. It is as old as falsehood and as versable as human ingenuity."

*United States v. States*, 488 F.2d 761, 764 (8th Cir.1973) (quoting *Blachly v. United States*, 380 F.2d 665, 671 (5th Cir.1967)). Here, the scheme's use of misrepresentations and sequestering of collateral, with the alleged purpose of depriving the lenders of the market value of their collateral, falls within the ambit of mail and wire fraud. Thus, we reject the defendant's contention that the scheme is not a crime under sections 1341 and 1343.

### B. Sufficiency of the Evidence.

The defendants next claim that even if the alleged scheme is an indictable offense under the mail and wire fraud statutes, the evidence is insufficient to support the verdict. Because the defendants appeal from an adverse jury verdict, we are "required to view the evidence in the light most favorable to the verdict, giving the prosecution the benefit of all inferences reasonably

---

**2.** The defendants also claim that they were denied due process by being convicted for actions they did not know were criminal. After a careful review of the record, we reject this contention without further discussion.

to be drawn in its favor from the evidence." *United States v. Lincoln,* 630 F.2d 1313, 1316 (8th Cir.1980). Applying the same standard on the defendants' motion for post-conviction relief, the trial court stated:

> The evidence submitted in this case is capable of at least two diametrically opposed interpretations, one of which is that defendants merely counseled various individuals in the technique of "hard ball" negotiations with government bureaucrats. This court does not find anything inherently illegal in this type of counseling, nor is this court convinced that a conviction for this type of counseling would be sustainable as a violation of sections 371, 1341, or 1343, Title 18, United States Code.

> The jury, however, subscribed to the alternative interpretation of the evidence: that defendants counseled various individuals to commit illegal acts in an attempt to defraud not only these individuals, but also the federal government.

■ We agree with the trial court that sufficient evidence supports the jury's verdict. Contrary to the defendants' contention that they merely aided the farmers in "hardball bargaining" with lenders by offering below market prices for cattle, the evidence also indicates that the defendants attempted to defraud the lenders by paying below market prices for cattle subject to chattel mortgages, counseling the farmers to misrepresent material terms of the sale to the lenders, and agreeing to pay informal "kick-backs" to the farmers to induce their cooperation.

A review of the record indicates that the defendants executed this scheme on several occasions, forming the predicate acts for the mail and wire fraud violations.

**1. The Dallas Heidt Transaction.**

In the summer of 1984, the defendants first contacted Dallas Heidt, a financially distressed cattle rancher, and advised him that they could help resolve his financial difficulties for approximately $10,000. In particular, the defendants and Heidt discussed the sale of Heidt's cattle, that were subject to liens by the FmHA and the Bank of Steele. After considerable negotiations and discussion, Heidt agreed to sell 376 head of cattle for $390 per cow/calf pair. The cattle were delivered to the Wolff Ranch in South Dakota, where (except for the calves) they were branded with defendant Little's brand. In addition to the cash payment of $83,850, Heidt testified that in consideration for the sale, he had an option to repurchase the cattle free of the mortgage lien. Indeed, from the beginning of the negotiations, the defendants indicated that a material term of the transaction was Heidt's option to repurchase the cattle free of the lien, and emphasized that the lower the sale price for the cattle, the less expensive it would be for Heidt to buy them back. For this reason, defendant Little initially suggested a price between $315 and $330 per cow/calf pair.

In the course of this sale, the defendants counseled Heidt to make numerous misrepresentations to his lenders. The defendants first suggested that Heidt sell the better half of his herd at a price below market value, and, to induce his lenders to accept the sale, advise them that only the poorer cattle had been sold. Later, when Heidt was skeptical about whether the FmHA would agree to the sale price, defendant Little advised Heidt to devise a story for the FmHA, and suggested that Heidt could excuse the price on the shortage of feed and bad weather conditions. In addition, at defendant's request, Heidt purposely concealed the anticipated sale of the cattle to defendants when he spoke with FmHA officials about his financial situation and the possibility of liquidating his collateral.

Moreover, as part of the scheme, the defendants attempted to conceal the terms of the sale of the collateral from the lenders. They participated in moving the cattle from the Heidt's ranch to a location in South Dakota, where they could not be inspected by the county supervisor. Indeed, defendant Bishop specifically counseled the removal of the collateral upon learning of the supervisor's imminent inspection. Additionally, after learning that

the authorities questioned the Heidts about the propriety of the sale, defendant Larson proposed that, to show the transaction in a better light, the parties take the position that the calves were not supposed to be included in the sale, and to "hang tough and keep with our story." Former defendant Allen Larson then contacted the FmHA and advised that this was the case, but as Heidt testified, this story was a lie. Also Heidt's son, Mike Heidt, testified that he believed that the calves would be sold with the cows and that no one indicated a mistake was made when he delivered the calves to the Wolff ranch.

### 2. Lynn and Orville Wolff Transactions.

Lynn and Orville Wolff were brothers who had separate ranching operations in South Dakota near Haynes, North Dakota. Lynn had his own ranching operation; Orville managed an operation called Wolfco which was owned by him, his parents and another brother. After a series of meetings with the defendants in 1984, three separate cattle sales were made, two by Lynn Wolff and one by Orville Wolff.

### a. First Lynn Wolff Transaction.

Lynn Wolff testified that Little advised him to sell some of his cattle to him and that Wolff would later have an opportunity to repurchase or to share in profits from a resale of the cattle. The price was set by Little at $360 per cow/calf pair for 100 pairs. Wolff told Little that that was "not very much" but agreed to go along with the sale. Wolff took the check to the bank and represented that he could not get more for the cattle, but did not reveal to the bank that he had an agreement with Little to repurchase or later share in the profit from a future sale of the cattle. These cattle were later repurchased by Lynn Wolff through a third party and are still in his possession.

A banker from the First Bank of Lemmon, South Dakota, testified that Wolff represented to him that he had to sell at a the cattle at a low price because they were thin and old. Lynn Wolff presented a check for $36,000 to the bank at the end of June, 1984. According to Orville Wolff, however, the cattle were in good condition. The manager of a nearby livestock auction indicated that, at that time, comparable cattle were selling for between $525 and $600 per cow/calf pair. The bank accepted the check and suffered a loss on the cattle.

### b. Second Lynn Wolff Transaction.

In August, 1984, Lynn Wolff discussed a second cattle sale with the defendants. Wolff decided to sell the remainder of his herd which included 120 cow/calf pairs and approximately 61 yearlings which he had earlier shipped to a feed lot in Nebraska for fattening at the urgings of Little. Again, Wolff understood that he would later have an opportunity to repurchase the cattle or to share in profits from resale. A price of $380 per cow/calf pair and approximately $250–260 per yearling was decided upon. Wolff received a check from Platte Valley Commodities for $64,840 with the notation "188 head of cattle."

A banker at the First Bank of Lemmon stated that when Lynn Wolff presented the check, he indicated it was for 133 cow/calf pairs and 50 yearlings. Wolff also stated he was getting out of the cattle business, but did not indicate that he stood to share in future profits from the cattle. The banker decided not to accept the check and made attempts to inspect the cattle. When Little learned of this, he advised Wolff to go to great lengths to keep the cattle hidden from the bank. The bank persisted in its efforts and finally obtained possession of the cattle. Soon thereafter, the bank sold the cattle (57 yearlings, 121 cows, 114 calves). After payment of expenses, the bank recovered $78,511.16, approximately $13,670 more than the $64,840 check originally tendered by Wolff.

### c. Orville Wolff Transaction.

In June, 1984, Orville Wolff sent approximately 150 head of cattle to the livestock yard in Nebraska on the advice of Little. Around July 1, 1984, Wolff negotiated a sale of thirty-five cow/calf pairs with the defendants. The price was set at $360 per

cow/calf pair. When Wolff received a check for $12,600 with a notation on it for thirty-five cow/calf pairs, he immediately called Larson and told him that he did not think the Production Credit Association (PCA) would accept the check. Larson told him he would send a different check. The check arrived for the same amount, but with a notation "35 cows" and no reference to any calves, even though it was the cow/calf pairs that were sold.

Orville Wolff testified that he brought the second check to his banker and indicated the sale was for thirty-five cows. The PCA loan officer indicated that Wolff said the check was for "cull cows." PCA accepted the check. According to the manager of a local livestock auction, cow/calf pairs were selling at that time for between $525 and $600. Thus, the value of the thirty-five pairs sold ranged from $18,000 to $21,000, substantially more than the $12,600 paid by Little. At Little's direction, the cattle were moved to North Dakota after both the bank and FmHA were out looking for them.

In November, 1984, Lynn Wolff repurchased his 100 cow/calf pairs along with his brothers' thirty-five pairs through a local attorney. The attorney testified that "as part of the purchase he had agreed to give Lynn an option to buy these back at that fixed price of $385 a head."

#### d. The Michael Bishop Transaction.

Prior to going into business with Little, Bishop was a financially strapped farmer in North Dakota. The evidence reveals that Bishop, like the other ranchers contacted by defendant Little, agreed to sell cattle to Little for below market value and to represent to the bank that he got the best price possible. The bank accepted Bishop's check based on his misrepresentations.

All of the evidence, taken together, is more than sufficient to support the convictions of defendants Little, Larson, and Bishop.

#### C. The Jury Instructions.

The defendants claim they were deprived of their right to a fair trial because the district court failed to instruct the jury on the defense of good faith and instructed the jury that "success or failure of the alleged scheme to defraud is immaterial."

The standard of review for determining the adequacy of jury instructions is "whether the instructions, when taken as a whole, adequately advise the jury of the essential elements of the offenses charged and the burden of proof required of the government." *United States v. Sherer*, 653 F.2d 334, 337 (8th Cir.1981). The defendants did not request a good faith instruction at trial, nor did they object to the success or failure instruction. Thus we review the instruction under the plain error rule and find no such error.

#### 1. Good Faith.

"Good faith is a complete defense to a charge of mail fraud, and a defendant is entitled to such a charge if there is evidence to support the theory." *Sherer*, 653 F.2d at 337. Here, there was no evidence to support this theory. The defendants did not argue or present evidence that they counseled the farmers to misrepresent the value of the cattle to the bank or promised the farmers a share in the profits after selling the livestock without knowing that either act was unlawful; rather, they argued that they did not do either act. They denied any false statements or any promises to the farmers. Bennett Little, the only defendant to testify, specifically denied promising money on resale to the farmers or advising them to lie to the banks. The instructions delivered by the trial court more than adequately informed the jury as to the elements of the crimes of mail fraud and wire fraud.

#### 2. Success or Failure.

The challenged portion of the instruction stated:

Success or failure of the alleged scheme to defraud is immaterial. It is not necessary to show that any person was in fact defrauded to prove the crimes of wire fraud or mail fraud.

The defendants assert this instruction was erroneous without further instruction that success or failure of the scheme is relevant to the element of intent, relying on *United States v. Foshee*, 569 F.2d 401 (5th Cir. 1978).

In *Foshee*, the defendants were charged with mail fraud based on an elaborate check kiting scheme in which the Foshees wrote a series of insufficient fund checks. The checks were all paid back, however, before any of the banks complained. *Foshee*, 569 F.2d at 402. During defense counsel's closing argument, the district court interrupted and instructed the jury that "the success or failure of a scheme to defraud is immaterial, so it is not necessary that someone be actually cheated in the case." 569 F.2d at 403. Even though the trial court's final instructions included a statement that success or failure of the scheme bore on intent, the Circuit Court held this "could not cure the immediate, prejudicial impact of the unadorned statement that lack of success was immaterial." 569 F.2d at 405. The rationale for the *Foshee* holding is that the instruction short-circuited the defendants' defense that they had no intent to deceive.

■ This rationale is simply not applicable in this case. The defendants never indicated that they made the statements but did not intend to deceive the banks. In any event, the challenged instruction, when viewed in the context of the instructions as a whole, adequately instructed the jury on the necessary intent.

## D. Ineffective Assistance of Counsel.

■ The defendants claim that trial counsel's failure to request a good faith instruction and failure to object to the success or failure instruction constituted ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, a defendant must show that the assistance was ineffective and that he was prejudiced. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Without considering the first prong, we hold that the defendants were not prejudiced by their counsel's claimed inaction

regarding the jury instructions. The charge to the jury was adequate.

## E. Larson's Request for a New Trial.

Appellant Larson alone contends that the trial court erred in denying his motion for a new trial. The grounds for Larson's motion were that after trial, he discovered new exculpatory evidence that at about the time Dallas Heidt sold the cattle to Little, he sold some calves to Allan Jensen. Larson contends that this "new evidence" was exculpatory because it indicated that Heidt did not sell all of the cattle he claimed he sold to Little, thus negating any finding that the cattle were sold at an unfairly low price.

To prevail on his motion for a new trial, Larson was required to show:

(1) the evidence must be in fact newly discovered, that is, discovered since the trial; (2) facts must be alleged from which the court may infer diligence on the part of the movant; (3) the evidence relied upon must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) it must be of such nature that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States v. Gustafson*, 728 F.2d 1078, 1084 (8th Cir.1984) (quoting *United States v. Swarek*, 677 F.2d 41, 43 (8th Cir.1982), *cert. denied*, 459 U.S. 1102, 103 S.Ct. 723, 74 L.Ed.2d 949 (1983)).

In denying this motion, the trial court held that the evidence of the sale to Mr. Jensen was not new because it had been disclosed to Larson before trial, that Larson did not diligently pursue investigation of this information, and that the presentation of such evidence would not have produced an acquittal.

■ We hold that the trial court did not abuse its discretion in denying Larson's new trial motion. Although the government apparently did not disclose evidence of Heidt's sale of calves specifically to Jensen, it did disclose and make available to Larson evidence of the sale of the calves. Appellant Larson could have investigated

this information more thoroughly before trial to learn who purchased the cattle, but, as the trial court observed, he did not investigate this matter until after trial. As the trial court further pointed out, the evidence of the sale of calves to Jensen would not have been likely to produce an acquittal because the evidence also indicated that the Heidts kept cattle on their ranch in addition to what was sold to Little, and other persuasive evidence indicated that the calves sold to Jensen were not the calves sent to the Wolff ranch. For these reasons, we reject Larson's contention that he is entitled to a new trial.

### F. Bishop's Claim.

Bishop claims the trial court abused its discretion in submitting this case to the jury when the court believed the defendants' actions were not criminal. Bishop is essentially asking that his conviction be reversed because his fate was decided by the jury rather than the trial court. We cannot grant such a request. The trial court properly submitted this case to the jury.

Affirmed.