United States Court of Appeals,

Eleventh Circuit.

No. 94-8782.

UNITED STATES of America, Plaintiff-Appellee,

v.

Saeed SIRANG, a/k/a Steve Sirang, Defendant-Appellant.

Dec. 12, 1995.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:92-CR-376-01-JOF, Forrester), Owen J., District Judge.

Before HATCHETT and EDMONDSON, Circuit Judges, and GIBSON[*], Senior Circuit Judge.

JOHN R. GIBSON, Senior Circuit Judge:

Saeed Sirang appeals his conviction on one count of wire fraud, 18 U.S.C. § 1343 (1988), *amended by* 18 U.S.C. § 1343 (Supp. V 1993), and six counts of bank fraud, 18 U.S.C. § 1344 (1988), *amended by* 18 U.S.C. § 1344 (Supp. V 1993), in connection with checks he wrote and funds he transferred around the time of Black Monday, October 19, 1987, the day the stock market crashed. Sirang argues that the district court erred in failing to give several good faith defense instructions, and that the eleven-count indictment was multiplicitous. We affirm the convictions.

The facts are not in dispute, except insofar as they bear on Sirang's belief that his friend Michael Wallace would cover the various checks Sirang drew.

Sirang had become an active trader in the stock market in 1979 when he was twenty-five years old. By 1987 Sirang managed the

[*]Honorable John R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

investments of Willow Development Company, his own company, and Wallace Trading Company, which was owned by Sirang's wealthy college friend, Michael Wallace. Wallace had lent Sirang $700,000 to establish Willow Development and had begun Wallace Trading with $1 million of his own funds. The business purpose of Wallace Trading was to buy and sell securities on margin. Wallace had no background in this business and relied on Sirang to do the trading.

Willow and Wallace Trading maintained margin accounts at several brokerage houses. Under these accounts, Sirang was permitted to buy stocks without paying immediately. He was required to pay fifty percent of the purchase price within five business days of the purchase, but could wait to pay the other fifty percent until he sold the stock. At times he failed to pay by the fifth day or improperly sold the stock without ever having paid for it. Accordingly, the brokerages had placed restrictions on Willow's and Wallace Trading's brokerage accounts, and had closed some of the accounts.

On October 9, 1987, Sirang bought $4.4 million worth of stock through E.F. Hutton on margin for the Wallace Trading Account. The initial fifty-percent payment of $2.2 million was due on Monday, October 19. Wallace Trading also had margin calls to make at Smith, Barney (about $200,000) and at Holmans, McGraw ($2.75 million) on that Monday morning. On Friday, October 16, Sirang wrote a National Bank of Georgia (NBG) check from Willow to Wallace Trading for $600,000, depositing it in the Wallace Trading account at C & S Bank. Once the $600,000 check was credited to Wallace Trading's account, the balance in the account was $47,000.

(However, there was also $600,000 in other outstanding checks on the C & S account, see page 5, *infra* ).  The Willow account did not have the money to cover the check, and Sirang testified that he intended to cover the Willow check with proceeds from selling stock on Monday.

On Friday the market had fluctuated dramatically.  Early Monday morning Sirang went to E.F. Hutton.  It was already apparent that the market was very unstable.  While at E.F. Hutton, Sirang talked to Wallace in California.  He told Wallace that Wallace Trading faced substantial losses and that it had margin calls to meet.  Sirang asked if Wallace was prepared to send money to meet the margin calls.  He testified that Wallace told him to call late in the afternoon and report the exact loss.

Before talking with Wallace again, Sirang wrote four checks to E.F. Hutton from the Wallace Trading account at C & S totalling $2.2 million, even though he admitted, "[W]hen I wrote the checks I didn't have the money at C & S."  Instead of writing one check for the whole $2.2 million amount, Sirang testified that he used four separate checks so that if he could not cover the entire amount, at least some of the checks would clear.  As soon as Sirang had ostensibly paid the E.F. Hutton margin call (though with checks drawn on insufficient funds), he gave orders to liquidate Wallace Trading's E.F. Hutton account.  E.F. Hutton informed him that he would have about $1,665,000 after his account was liquidated.  Sirang had the ability to write checks on Wallace Trading's E.F. Hutton account, so he drew three checks on the account, totalling $1.6 million, and deposited those checks in Willow's account at

NBG. He also stopped payment on the $600,000 check drawn on Willow's account at NBG, which he had deposited to Wallace's account at C & S.

At this point Sirang "knew I had 1.6 million dollars approximately in NBG, and I knew I had nothing anywhere else. I had no money coming to me from anywhere else." He knew that Wallace Trading's C & S account was overdrawn by $2.8 million, being the $2.2 million he had written to E.F. Hutton and the approximately $600,000 by which it had been overdrawn before he deposited the $600,000 check drawn on Willow's NBG account, upon which he had now stopped payment. As we have said, there was also another outstanding check on the account for about $600,000, see page 5, *infra.*

Sirang testified that he called Michael Wallace and notified him about the losses Wallace Trading had sustained and that $2.8 million in checks were about to be presented to the Wallace Trading account at C & S, which did not have the money to pay them. Sirang said he told Wallace that he would transfer $2.8 million from his account at NBG to cover Wallace Trading's account at C & S if Wallace would wire him the $2.8 million in time to cover the NBG checks when presented. According to Sirang, Wallace promised to wire the money.

On Tuesday, October 20, C & S discovered a check had been presented for payment from the Wallace Trading account which would have caused the account to be overdrawn by about $600,000. (This was *before* C & S discovered that Sirang had stopped payment on the $600,000 check from Willow or that Sirang had given E.F. Hutton

$2.2 million in checks drawn on the C & S account). C & S asked Sirang to deposit $600,000 in the form of a cashier's check before C & S would honor the check that had already been presented. Accordingly, Sirang withdrew $600,000 from Willow's NBG account to buy a cashier's check, which he deposited in the Wallace Trading C & S account. C & S then paid the check that had been presented. This left Sirang $1 million at NBG.

Later the same day Sirang deposited four checks, totalling $2.8 million, from the NBG Willow account into the C & S Wallace Trading account. C & S treated those checks as available funds in the account, even though it had not yet collected payment on the checks. On October 20 and October 21 C & S paid the $2.2 million worth of checks Sirang had written E.F. Hutton to make his margin call.

Despite having just written $2.8 million in checks on the NBG account (which only contained $1 million), Sirang then transferred the money remaining in the NBG account to his relatives. On October 21, he withdrew $750,000 from the Willow NBG account and wire-transferred it to his father-in-law. Sirang claims he owed his father-in-law money for an apartment in Teheran. The same day he used $202,000 from NBG to pay off two loans he had at NBG. Both loans were secured with certificates of deposit belonging to Sirang's wife. After Sirang paid the loans, NBG released the certificates of deposit.

Sirang testified that he again talked to Wallace late that same afternoon (Wednesday, October 21). Wallace told Sirang he would need to meet with him and review the documentation showing

Wallace Trading's losses before transferring money to cover the losses.

The next morning, Thursday, October 22, Sirang's banker at NBG discovered that four checks worth a total of $2.8 million had been presented for payment against the now-empty Willow account at NBG. Sirang came into NBG and met with his banker, who advised him that NBG would not cover the checks. Sirang asked for advice and his banker advised him to stop payment on the checks, which were then returned to C & S.

Wallace never sent the money. C & S lost approximately $2.8 million on the checks it paid for Wallace Trading on the strength of the uncollected NBG checks. C & S sued Sirang, and he negotiated a settlement under which he paid half of the losses incurred for a full release of C & S's claims. (This money included the return of the $750,000 Sirang had wired to his father-in-law.)

A grand jury indicted Sirang on ten counts of bank fraud, 18 U.S.C. § 1344, and one count of wire fraud, 18 U.S.C. § 1343. The first count was based on the deposit of the $600,000 cashier's check at C & S. The second through fifth counts were based on Sirang's deposits at C & S of the four checks totalling $2.8 million to make it appear that the E.F. Hutton checks were covered. The sixth count was based on Sirang's withdrawal of the $202,000 used to pay off the NBG loans that were secured by Sirang's wife's property. The seventh through tenth counts were the stop payment orders on the checks written on NBG and deposited in the C & S account. Finally, the eleventh count was the wire fraud count,

based on the wire transfer of $750,000 to Sirang's father-in-law.

Sirang moved to dismiss the indictment for multiplicity, and the district court denied his motion.

The main issue at trial was whether Sirang acted with fraudulent intent or whether he believed he could cover the checks. The government produced witnesses from banks and various brokerages who testified about Sirang's history of overdrafts and late payments and his violations of stock exchange rules in handling his margin accounts. They established that Sirang had, more than once, written checks knowing that he did not have enough money in the account to cover the check.

Sirang introduced the testimony of Michael Wallace, who testified that he had promised on Black Monday that he would wire $2.8 million to cover the losses and that he had reneged. On the other hand, an FBI agent testified that when he interviewed Sirang after the $2.8 million loss, first on October 30, 1987, and again a year later with counsel present, Sirang gave other explanations of what money he thought was available to cover the checks. The agent's detailed recitation of Sirang's statement did not include anything about Wallace paying the checks.

The jury acquitted Sirang on the seventh through tenth counts, based on the stop payment orders, but convicted on the other counts. The court sentenced Sirang to one year imprisonment on each of counts one through six to run concurrently, five years suspended sentence on count eleven, and five years probation with the special condition that Sirang pay $1.4 million restitution to C & S.

Sirang argues that the district court erred in refusing three proffered jury instructions bearing on the issue of good faith. Sirang's lawyers submitted the Eleventh Circuit pattern instruction for the good faith defense and two supplemental good faith instructions. The court agreed that a good faith instruction was necessary: "[I]t is the defendant's theory of [the] case that he had the wherewithal to cover, he thought he had the wherewithal to cover those checks when they were presented at NBG, and I am obliged to [tell] them, if he had that belief in good faith, he's got a defense." At the charge conference the court submitted for counsel's review a good faith instruction that differed from the one Sirang had requested. Sirang's lawyers objected: "I object to having no, you know, single instruction that in my view represents the theory of defense or essentially good faith that there is a standard good faith charge." The court replied:

> Your good faith charge as presented to me is not tailored to the evidence. I have put in a good faith charge[.] [I]t is not the one you requested.
>
> [Sirang's counsel]: Okay.
>
> The Court: I have put in that he can rely on anything that he thought that he had available to him that would make those checks good when presented. I don't know where, now, you can certainly argue your defense from this charge, it's in there several times.
>
> [Sirang's counsel]: I understand.

The court then instructed the jury:

> You may consider all of the possibilities that the defendant in good faith thought that he had to cover the checks before they were presented or returned. And you may consider all of the defendant's other acts to the extent that they shed light on whether or not he intended the checks would be honored when presented or returned. Or whether he did not.

The court also instructed:

Statements or representations are false or fraudulent if they relate to a material fact, if they are known to be untrue or if they are made with the reckless indifference as to the truth or falsity of the statement.

Further, a statement that is as to a material matter that is untrue or made with reckless indifference as to the truth or falsity must be shown to have been made with an intent to defraud. A statement or representation may also be false or fraudulent when it constitutes a half truth or effectively conceals a material fact with the intent to defraud. A material fact as it relates to this case is one that would be important to a reasonable banker in deciding whether or not to engage in a particular transaction.

Now, I have used the term "to act with the intent to defraud". That means to act knowingly and with the specific intent to deceive someone ordinarily for the purpose of causing a financial loss to another or bringing about a financial gain to one's self.

The intent is to be judged as of the time, in this case, of the banking transaction. And subsequent acts do not change the character of the original intent, but they may shed light on what the original intent was.

In this case the scheme or artifice to defraud has been loosely referred to by counsel as a check kite. You need to understand that a check kite is not the depositing of a check drawn on another bank where there is insufficient funds to pay that check. In other words, negotiating an insufficient funds check is not either a check kite or made criminal under this statute.

If, however, somebody deposits a check in one bank, drawn on an account in another bank, and if he deposits it knowing the bank into which it is deposited will honor checks on the balance so created, and if he does it knowing that the check will not be honored at the bank on which it is drawn or that it will not be made good at the time that it is returned, then a defendant who does that may be found guilty of these offenses.

Sirang's attorney argued in summation that Sirang acted in reliance on Wallace's promise to send money to cover the checks.

Sirang now argues that the court erred in rejecting the

proffered Eleventh Circuit pattern instruction,[1] and specifically that the instruction the court gave erroneously failed to state that (1) good faith was a complete defense and (2) Sirang did not have the burden of proof as to good faith.

We review the district court's refusal to give a requested instruction for abuse of discretion. *United States v. Morris*, 20 F.3d 1111, 1114 (11th Cir.1994). Generally, a refusal to give a requested instruction is an abuse of discretion if: (1) the instruction is correct; (2) the court did not address the substance of the instruction in its charge; and (3) the failure to give the instruction seriously impaired the defendant's ability to

---

[1] Sirang's proposed instruction based on the Eleventh Circuit pattern instruction read as follows:

> I also instruct you that good faith is a complete defense to the charges in the indictment since good faith on the part of the Defendant is inconsistent with intent to defraud or willfulness which is an essential part of the charges. The burden of proof is not on the Defendant to prove his good faith, of course, since he has no burden to prove anything. The Government must establish beyond a reasonable doubt that the Defendant acted with specific intent to defraud as charged in the indictment.
>
> One who expresses an opinion honestly held by him, or a belief honestly entertained by him, is not chargeable with fraudulent intent even though his opinion is erroneous or his belief is mistaken; and, similarly, evidence which establishes only that a person made a mistake in judgment or an error in management, or was careless, does not establish fraudulent intent.
>
> On the other hand, an honest belief on the part of the Defendant that a particular business venture was sound and would ultimately succeed would not, in and of itself, constitute "good faith' as used in these instructions if, in carrying out that venture, the Defendant knowingly made false or fraudulent representations to others with the specific intent to deceive them.

present an effective defense. *Id.* at 1115-16. A defendant is entitled to a specific instruction on his theory of defense, not an abstract or general one. *United States v. Lewis,* 592 F.2d 1282, 1286 (5th Cir.1979).

In *Lewis,* 592 F.2d at 1284-87, the court held that it is error to refuse a good faith defense instruction in a fraud trial if there is evidentiary support for the charge. However, in later cases, it has become clear that *Lewis* does not set out a *per se* rule, but that refusal of a good faith instruction must be tested by the general standards set out above. In *Morris,* we reversed a conviction for filing a false tax return because the court refused a good faith instruction; however, we did so only after analyzing the particular facts of the case under the three-part test. 20 F.3d at 1116-18. We concluded the instructions the court actually gave in *Morris* did not instruct that the false filing had to be made "knowingly." *Id.* at 1117. Additionally, *Morris* emphasized the unusual nature of the scienter element in criminal tax laws, in which mistake of law is actually a defense, and which, therefore, made it especially important to charge the jury on the good faith defense. *Id.* at 1117-18. This latter factor, of course, does not exist in Sirang's case.

In *United States v. Walker,* 26 F.3d 108 (11th Cir.1994) (per curiam), we affirmed a fraud conviction in which the district court declined to give a good faith instruction in addition to the instruction on intent to defraud. We held that the court had addressed the substance of the instruction in the charge on specific intent, because "[a] finding of specific intent to deceive

categorically excludes a finding of good faith." *Id.* at 110 (quoting *United States v. Chenault,* 844 F.2d 1124, 1130 (5th Cir.1988)). *Compare United States v. Rochester,* 898 F.2d 971, 978 (5th Cir.1990) ("failure to instruct on good faith is not fatal when the jury is given a detailed instruction on specific intent and the defendant has the opportunity to argue good faith to the jury"); *United States v. Mancuso,* 42 F.3d 836, 847 (4th Cir.1994) ("If the district court gives adequate instruction on specific intent, a separate instruction on good faith is not necessary."); *United States v. Dockray,* 943 F.2d 152 (1st Cir.1991) (same; surveying circuits); *United States v. Ribaste,* 905 F.2d 1140, 1143 (8th Cir.1990) (intent instruction adequate); *with United States v. Hopkins,* 744 F.2d 716, 718 (10th Cir.1984) (en banc) (requiring good faith instruction). From *Morris* and *Walker* we learn that failure to give the proffered instruction on good faith is not per se error, but that we must examine the facts of the case to determine the adequacy of the instructions as a whole and the effect of the omission on the defendant's case.

Importantly, the district judge in this case did not refuse to give a good faith instruction. He rejected the proffered instruction because he considered it inapposite to the facts of the case. The proffered instruction refers to "one who expresses an opinion honestly held," whereas Sirang argued not that he mistakenly thought he had money to cover the checks, but that he had a reasonable expectation that he would receive money in time to cover the checks. When counsel objected that the district judge had not included the proffered instruction, the district court told

counsel that the proffered instruction was "not tailored to the evidence" and "I have put in a good faith charge[.] It is not the one you requested." Counsel replied first, "Okay," and later, "I understand." Counsel made no further objection to the instruction (or lack of instruction).

Under Federal Rule of Criminal Procedure 30, defense counsel must object to omissions "stating distinctly ... the grounds of the objections." While we do not insist on an extremely technical reading of Rule 30, *see, e.g., United States v. Edwards,* 968 F.2d 1148, 1152-53 (11th Cir.1992), *cert. denied,* --- U.S. ----, 113 S.Ct. 1006, 122 L.Ed.2d 155 (1993), the objection should be sufficient to give the district court the chance to correct errors before the case goes to the jury. *Id.; United States v. Boruff,* 909 F.2d 111, 118 (5th Cir.1990), *cert. denied,* 499 U.S. 975, 111 S.Ct. 1620, 113 L.Ed.2d 718 (1991). Without such an objection, we review only for plain error. *United States v. Vazquez,* 53 F.3d 1216, 1221 (11th Cir.1995).

Here, counsel objected, but the district judge discussed the objection with counsel, giving the reason why he substituted his own instruction, which referred to the good faith theory counsel wished to emphasize. Counsel failed to make additional specific objections, but now argues that the substituted instruction failed to state explicitly that good faith was a defense and that Sirang did not have to prove good faith.

Counsel's responses and lack of further objection allowed the judge to conclude that he had addressed the objections that had been stated. Thus, we review the good faith charge only for plain

error. Even if there are inadequacies in the good faith instruction given by the court, the instructions made it clear that the burden was on the government to establish intent to defraud, which meant "to act knowingly and with the specific intent to deceive" for the purpose of causing a financial loss. As we have said, the finding of specific intent to deceive categorically excludes a finding of good faith. *See Walker,* 26 F.3d at 110. We conclude that if there was error in the instruction, it was not plain, clear, or obvious, *Vazquez,* 53 F.3d at 1222, and so did not rise to the level of plain error.

Besides the Eleventh Circuit pattern instruction, Sirang also argues that the court erred in refusing two supplementary good faith instructions. The first proposed instruction states that "a person who writes a check with the reasonable expectation that sufficient funds will be available by the time the check clears the bank lacks the requisite fraudulent intent." This instruction is confusing because the phrase "by the time the check clears the bank" does not specify whether it is the payor bank or depositary bank that the check must clear. Furthermore, the proffered language instructing the jury that funds must be available "by the time the check clears the bank," does not square with the law requiring funds to be available "at the time [the check] was presented for payment." *See United States v. Foshee,* 569 F.2d 401, 403 n. 2 (5th Cir.), *modified on other grounds,* 578 F.2d 629 (5th Cir.1978). Finally, the phrase "clear the bank" misleadingly assumes that the check is ultimately paid, which of course, does not fit the evidence in this case. There was no error in refusing

to give this instruction.

The other proposed instruction stated: "Although repayment of a loan is not a complete defense to [fraud], the jury may consider repayment as bearing on the defendant's intent to defraud." Sirang paid half the amount of C & S's loss as settlement of a lawsuit long after the events in question. Partial payment under compulsion of litigation does not tend to prove lack of fraudulent intent, and under these circumstances such an instruction would have been misleading. On this basis alone, we could conclude that the district court did not abuse its discretion in refusing the instruction. *Cf. United States v. Foshee,* 578 F.2d 629, 632-33 (5th Cir.1978) (error to exclude evidence of full repayment "virtually within one week's time" of discovery by the bank examiner; remarking that fact of nonpayment tends to prove fraud). It is not necessary that we do so, however, as the judge instructed generally that "you may consider all of the defendant's other acts to the extent they shed light on whether or not he intended the checks would be honored when presented or returned." Sirang was permitted to introduce evidence of the payment. Counsel commented on this payment in his summation, and the jury was permitted by instruction to consider the evidence. The court did not abuse its discretion in denying the proffered repayment instruction.

## II.

Sirang argues that counts one through six are multiplicitous and that counts one and six charge conduct that was not properly characterizable as fraud.

"An indictment is multiplicitous if it charges a single offense in more than one count." *United States v. Howard,* 918 F.2d 1529, 1532 (11th Cir.1990), *cert. denied,* 500 U.S. 943, 111 S.Ct. 2240, 114 L.Ed.2d 482 (1991). Although we stated in *Howard* that we would review the multiplicity holding for abuse of discretion, *id.,* we actually conducted a legal analysis of the appellants' double jeopardy arguments, *id.* at 1532-33, which was essentially de novo. *Cf. United States v. Nguyen,* 28 F.3d 477, 482 (5th Cir.1994) (applying de novo standard to multiplicity arguments). Similarly, legal analysis is necessary for review of Sirang's multiplicity argument.

Under 18 U.S.C. § 1344, a defendant may be charged in separate counts for each "execution" of the scheme to defraud. *United States v. Lemons,* 941 F.2d 309, 317 n. 5 (5th Cir.1991) (per curiam); *United States v. Poliak,* 823 F.2d 371, 372 (9th Cir.1987), *cert. denied,* 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988). A difficult conceptual question arises in section 1344 bank fraud cases as to whether particular transactions constitute an "execution" of a scheme or merely a component of such execution. *See, e.g., Lemons,* 941 F.2d at 317 n. 5. Relevant factors in determining whether there are multiple executions are the number of banks involved, the number of transactions, and the number of movements of money. *See United States v. Wall,* 37 F.3d 1443, 1446 (10th Cir.1994).

In check-kiting cases, separate checks have been considered separate executions of the scheme. *See Poliak,* 823 F.2d at 372; *United States v. Schwartz,* 899 F.2d 243, 248 (3d Cir.), *cert.*

*denied,* 498 U.S. 901, 111 S.Ct. 259, 112 L.Ed.2d 217 (1990); *see also United States v. Barnhart,* 979 F.2d 647, 650-51 (8th Cir.1992) (distinguishing checks in check-kiting cases from component acts in "a scheme to obtain a certain amount of funds or to obtain financing for a particular transaction"). Sirang argues that each of the four checks written on the NBG account was part of one transaction, but the evidence shows that he purposely chose to use multiple transactions to better his position with C & S. As the Ninth Circuit has remarked, "[T]wo transactions may have a common purpose but constitute separate executions of a scheme where each involves a new and independent obligation to be truthful." *United States v. Molinaro,* 11 F.3d 853, 861 n. 16 (9th Cir.1993), *cert. denied,* --- U.S. ----, 115 S.Ct. 668, 130 L.Ed.2d 602 (1994); *see also Mancuso,* 42 F.3d at 847-48; *United States v. Hord,* 6 F.3d 276, 282 (5th Cir.1993), *cert. denied,* --- U.S. ----, 114 S.Ct. 1551, 128 L.Ed.2d 200 (1994). There is no abuse of discretion in permitting these transactions to be indicted separately.

Finally, Sirang claims that counts one and six are based on conduct that cannot be characterized as fraud. Count one is based on Sirang's deposit of the $600,000 cashier's check at C & S, in response to C & S's call to Sirang informing him that Wallace Trading had a potential overdraft. The evidence at trial supported the inference that Sirang made this deposit to pacify C & S and thereby lull the bank into paying the E.F. Hutton checks which would be presented later that day. Therefore, we uphold his conviction on count one.

Count six is based on the transfer of the $200,000 to pay off

the NBG loan and thereby release certificates of deposit belonging to Sirang's wife.  At the time Sirang took that money out of NBG, C & S was holding $2.8 million in NBG checks, payment of which depended in part on that $200,000 staying in the NBG account. Thus, Sirang took money that would have been available to pay the checks held by C & S.  Thus, the conduct indicted in count six was properly characterized as fraud.

.   .   .   .   .

We AFFIRM Sirang's convictions.