[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-13656
Non-Argument Calendar
_____

D.C. Docket No. 2:15-cr-00037-RWS-JCF-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MATILDA PRINCE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(August 12, 2019)

Before ROSENBAUM, JILL PRYOR and FAY, Circuit Judges.

PER CURIAM:

Matilda Prince appeals her convictions for 29 counts of health care fraud, in violation of 18 U.S.C. § 1347.  We affirm.

## I. BACKGROUND

Prince was charged in a superseding indictment by a grand jury with 29 counts of health care fraud by filing 29 false claims for payment with Medicare and Medicaid, in violation of 18 U.S.C. § 1347.  The superseding indictment alleged the following.  Prince was the owner and operator of Pickens Eye Clinic, a company located in Jasper, Georgia, which purported to provide a variety of optometry and ophthalmology services to a primarily senior citizen population.  Her brother, Martin Prince, owned an eye care company called The Eye Gallery, which provided the same services and for which Prince worked, advertised, and provided eye care services.  Prince was never licensed in Georgia as a physician, optometrist, ophthalmologist, or dispensing optician.

In order to obtain reimbursement for the eye care services allegedly performed by Pickens Eye Clinic and The Eye Gallery, Prince entered "Current Procedural Terminology Manual" ("CPT") codes identifying medical services and procedures on claims she electronically submitted to Medicare and Medicaid, which, through fiscal intermediaries, relied on the codes in paying the claims.  The claims were submitted to Medicare and Medicaid using the names, identities, and uniquely assigned provider numbers of two medical providers who were licensed

2

optometrists that Prince had hired through a third-party physician contracting agency. Prince made claims to Medicare and Medicaid for optometry services that had not been provided.

In November 2010, Prince was ordered in a proceeding in the Superior Court of DeKalb County, Georgia, not to receive any benefits, or be employed or involved with, any entity that received Medicaid or Medicare funding for a period of five years and to pay restitution in the amount of $109,712.26 to Georgia Medicaid. She and Pickens Eye Clinic were also excluded by the U.S. Department of Health and Human Services from participating in Medicare, Medicaid, and all federal health care programs, making them ineligible to submit claims for any services provided after September 20, 2011.

The superseding indictment also alleged that Prince generated business by offering on-site eye exams and prescription glasses at no charge to Medicare and Medicaid recipients at public housing complexes with large senior citizen populations. After receiving Medicare and Medicaid numbers from recipients, she used their identities and the identities of the licensed optometrists to submit claims for optometry services, such as "closure of the lacrimal punctum by plug," and backdated claims for optometry services that were not rendered. The indictment included a table of the Medicare and Medicaid claims by date of service, date the claim was submitted, CPT code, and patient, separated into 29 counts. Counts 2

3

through 4 alleged that Prince had made fraudulent claims with respect to a patient named "W.M." for services dated June 27, July 18, and August 8, 2011.

Prince entered a not-guilty plea. The government filed a notice of intent to introduce evidence under Federal Rule of Evidence 404(b). It then filed a motion *in limine* to admit at trial intrinsic evidence or, in the alternative, to admit similar acts evidence under Rule 404. The exhibits included a single-count indictment from DeKalb County Superior Court on December 10, 2009, charging Prince with Medicaid fraud, in violation of § 49-4-146 of the Georgia Code. The exhibits also included Prince's state court criminal judgment and a later consent order to modify her sentence, which showed that Prince pled guilty to the count and was sentenced as a "first offender" to a ten-year term of probation, required to pay restitution of $109,172.26, and barred from owning, deriving income from, or being employed by any business that received Medicare or Medicaid funds for five years.

The district court granted the motion with respect to Prince's 2010 conviction for Medicaid fraud and sentencing under the Georgia First Offender Act and evidence of her exclusion from federal health care programs in 2011. It reasoned that the evidence was intrinsic because it was inextricably intertwined with the charged offenses and was therefore not prohibited by Rule 404(b). It also concluded that, even if it was not intrinsic, the evidence was still admissible under Rule 404(b).

4

Walter Morton and Debbie Sanders, residents of the Summerville Housing Authority apartment building, testified about their experiences with The Eye Gallery and Prince. They both testified that they received eye exams and ordered glasses when Prince visited their apartment building in May 2012. They each saw Prince a few more times when she came to their apartment building to deliver glasses, fit some residents for sunglasses, and deliver sunglasses. Prince billed Medicare and Medicaid for providing Morton and Sanders with the service of closing the lacrimal punctum by plugs multiple times and listed Dr. Carl Llabres as the treating optometrist. While Morton could not recall whether he had very small plugs placed in his tear ducts, Sanders confirmed that she did not receive that procedure, nor had she seen any residents getting plugs in their eyes during Prince's visits. Sanders identified three forms she had signed but not read, which she was required to bring to Prince on May 23, 2012, for the free eye exam and eyeglasses. The documents were claim forms, which showed she had plug procedures to close her tear duct openings on June 27, July 18, and August 8, 2011, billed through Pickens Eye Clinic. On cross-examination, she confirmed that she did sign the documents.

Dorothy Swift, an investigative analyst with the Department of Health and Human Services, Office of the Inspector General, testified regarding Prince and Pickens Eye Clinic's exclusion from Medicare in September 2011 based on her

state conviction.  The government asked the district court to give a limiting instruction regarding her testimony about Prince's state court conviction and exclusion from federal health care programs.  The district court instructed the jury that it could consider evidence of other violations or potential alleged violations of the law for the limited purpose of determining whether Prince had the intent to commit the crime charged, whether there was some accident or mistake on her part in committing the charged crime, and as proof of some method or means of accomplishing an illegal act, but not to decide whether she actually committed the crimes charged.

Mary Davis, Linda Romine, and Cindy Hightower also testified that they had attended Prince's clinic at their apartment complex, Calhoun Gardens, where they received eye exams, and some received glasses.  They each testified that they had not received punctum plugs.

Betty Lue Gordon, an employee at PRN Eye Associates, a referral services for optometrists, testified that she sent two optometrists, Dr. Llabres and Dr. Desarae Bonds, to Pickens Eye Clinic and The Eye Gallery.  In every case, she always dealt with Prince, not her brother.  Prince only requested optometrists to perform simple eye exams, never anything more invasive or complex.  Dr. Bonds also testified regarding working for Prince from 2010 to 2013 and how the punctum plugs procedure works.  She was not aware that Prince had submitted

6

claims for payment to Medicare and Medicaid under her name for performing the punctum plug procedure, and she never authorized Prince to bill Medicare or Medicaid under her name for those procedures.

On the third day of trial, the government informed the court that it would be calling witnesses to talk about Prince's state conviction and asked the district court about giving another limiting instruction. Prince's counsel did not request one, and the district court did not give one to avoid over-emphasizing the evidence. Robert Jones, a Georgia Medicaid investigative auditor, testified that Prince's restitution for her state conviction was paid in two lump payments. Additionally, Darlene Herndon, a Georgia Medicaid Fraud Control Unit auditor, testified over Prince's objection as to Prince's conviction in state court and explained that Prince was prohibited from owing or receiving any money from Medicare or Medicaid for ten years based on her state conviction.

The government submitted death certificates for Adrian Pickle and James Edwards, the other patients referred to in Counts 8 through 10 and 26 through 29 of the indictment, who died before trial. Dr. Llabres did not testify at trial.

The government rested, and the defense made a Federal Rule of Criminal Procedure 29 motion challenging the sufficiency of the evidence. The district court denied the motion. The defense then called V.J. Henville, an investigator with the Federal Defender Program, who testified that Lacrimedics, a company that

7

sold punctum plugs, provided records showing that Prince ordered several hundred punctum plugs from 2002 to 2010.  Lisa Riley, an employee of Prince from 2011 to 2013, testified that she observed a physician named Dr. Llabres perform the punctum plug procedure on residents at Calhoun Gardens.

After the defense rested and the court instructed the jury, Prince renewed her Rule 29 motion, which the district court denied.  In its charge to the jury, the district court again gave a limiting instruction on how the jury could consider Prince's similar acts leading to her state court conviction.  After 3 days of trial, the jury convicted Prince on all 29 counts.  The district court sentenced Prince to a below-guidelines term of 40 months of imprisonment for each count, to run concurrently, followed by 3 years of supervised release and ordered her to pay $607,347.51 in total restitution to Medicare and Georgia Medicaid.

On appeal, Prince first argues that her indictment for health care fraud was multiplicitous because it charged one crime in multiple counts.  Second, she argues that the district court abused its discretion by admitting evidence of her state conviction because it was not intrinsic evidence and was inadmissible under Federal Rule of Evidence 404(b).  She also argues that its probative value was substantially outweighed by the risk of undue prejudice.  Third, she argues that there was insufficient evidence to sustain a guilty verdict as to her submitting three false insurance claims under the name Walter Morton.

8

## II. DISCUSSION

### A. Multiplicity

Whether an indictment is multiplicitous is a question of law that we review de novo. *United States v. Pacchioli*, 718 F.3d 1294, 1307 (11th Cir. 2013). If a defendant fails to raise a claim that the indictment was multiplicitous before trial under Federal Rule of Criminal Procedure 12(b)(3)(B) and (c), we may review the forfeited claim for plain error. *United States v. Gonzalez*, 834 F.3d 1206, 1218 (11th Cir. 2016). "We may correct a plain error only when (1) an error has occurred, (2) the error was plain, . . . (3) the error affected substantial rights," and (4) "the error seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (alteration in original) (quoting *United States v. Cotton*, 535 U.S. 625, 631-32, 122 S. Ct. 1781, 1785 (2002)). "[A]n error cannot meet the 'plain' requirement of the plain error rule if it is not clear under current law." *United States v. Frank*, 599 F.3d 1221, 1239 (11th Cir. 2010) (quoting *United States v. Castro*, 455 F.3d 1249, 1253 (11th Cir. 2006)). Therefore, if the explicit language of the statute or rule does not specifically resolve the issue, and there is no precedent from us or the Supreme Court directly resolving it, there is no plain error. *Id.* As for sentencing challenges, we have held multiplicity to be "harmless error" where the conviction on one of the counts would stand and the defendant's sentences were concurrent. *Pacchioli*, 718 F.3d at 1308.

9

"An indictment is multiplicitous if it charges a single offense in more than one count. A multiplicitous indictment not only subjects the defendant to numerous sentences for one offense, but also 'prejudice[s] the defendant and confuse[s] the jury by suggesting that not one but several crimes have been committed.'" *United States v. Williams*, 527 F.3d 1235, 1241 (11th Cir. 2008). (alterations in original) (citations omitted) (quoting *United States v. Hearod*, 499 F.2d 1003, 1005 (5th Cir. 1974)). "A multiplicitous indictment therefore violates the principles of double jeopardy because it gives the jury numerous opportunities to convict the defendant for the same offense." *Id.* We use the *Blockburger*[1] test to determine whether an indictment is multiplicitous and verify that each count requires an element of proof that the other counts do not require. *Id.*; *see also United States v. Costa*, 947 F.2d 919, 926 (11th Cir. 1991) (holding that charges are not multiplicitous where they differ by even a single element or alleged fact).

What constitutes an "execution" of a scheme to defraud is a fact-specific inquiry. *United States v. De La Mata*, 266 F.3d 1275, 1287 (11th Cir. 2001). Whether a particular transaction is an "execution" of the scheme or merely a component of the scheme depends on "the ultimate goal of the scheme, the nature of the scheme, the benefits intended, the interdependence of the acts, and the number of parties involved." *Id.* at 1288.

---

[1] *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932).

We have interpreted the similarly worded bank fraud statute to allow for a defendant to be charged in separate counts for each "execution" of a scheme to defraud. *See id.* at 1287; *United States v. Sirang*, 70 F.3d 588, 595-96 (11th Cir. 1995). Although we did not rule directly on the issue of multiplicity in *De La Mata*, we defined what constituted a single "execution" of bank fraud. 266 F.3d at 1289. Specifically, we held that each signing of a lease with the victim bank, as opposed to each lease payment, constituted an execution of bank fraud because only the signing of the lease exposed the bank to new financial risks. *Id.* Similarly, in *Sirang*, the defendant was charged with four separate counts of bank fraud for withdrawing four checks from an account and depositing them into the receiving bank on the same day. 70 F.3d at 595-96. We rejected his multiplicity claim, holding that each check involved a separate movement of money and created a separate risk for the receiving bank, and thus, each check was a separate execution of the scheme. *Id.*

A person commits health care fraud when she:

knowingly and willfully executes, or attempts to execute, a scheme or artifice—

(1)     to defraud any health care benefit program; or

(2)     to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

11

in connection with the delivery of or payment for health care benefits, items, or services, [and as a result, the individual] shall be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C. § 1347(a).

Because Prince failed to raise a claim that the indictment was multiplicitous before trial, we review Prince's challenge only for plain error. *See Gonzalez*, 834 F.3d at 1218. Notably, Prince does not challenge her total sentences, and any possible error in her sentences was harmless because the alleged multiplicitous counts resulted in concurrent sentences. *See Pacchioli*, 718 F.3d at 1308. Prince cannot show there was any error in the indictment because each false claim she filed with Medicare or Medicaid was a separate execution of her scheme to defraud the government.

Although Prince's scheme targeted only Medicare and Medicaid, she achieved the ultimate goal in her scheme and the benefits she intended, obtaining payment, with each fraudulent claim she made to Medicare or Medicaid. *De La Mata*, 266 F.3d at 1288. Like the scheme in *Sirang*, Prince's scheme involved separate movements of money for each fraudulent claim against Medicare or Medicaid. *See Sirang*, 70 F.3d at 595-96. Moreover, for each count alleged in the indictment, the government was required to prove each element of § 1347 with respect to each separate claim, including that each transaction was fraudulent. *See Williams*, 527 F.3d at 1241. Accordingly, each claim was properly treated as a

12

separate execution of the scheme. the district court did not err, much less plainly err, by allowing the government to proceed under the superseding indictment. *See Frank*, 599 F.3d at 1239.

## B. State Conviction Evidence

We review the district court's decision to admit or exclude evidence for an abuse of discretion. *United States v. Crabtree*, 878 F.3d 1274, 1287 (11th Cir. 2018). We will affirm an evidentiary decision unless the district court made a clear error of judgment or applied the wrong legal standard. *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc). The abuse of discretion standard gives district courts considerable leeway, and they have a range of choice about whether to admit or exclude evidence. *Id.* at 1258-59. One reason for granting district courts discretion in their evidentiary rulings is that district courts may have knowledge about the case that is not conveyed in the record. *United States v. Brown*, 415 F.3d 1257, 1265 (11th Cir. 2005). "[A]ll doubt should be resolved in favor of admissibility" if the proffered evidence has substantial probative value and does not tend to prejudice or confuse the jury. *Frazier*, 387 F.3d at 1303 (quoting *United States v. Terebecki*, 692 F.2d 1345, 1351 (11th Cir. 1987) (Hill, J., dissenting)).

Rule 404(b) prohibits evidence of other crimes, wrongs, or acts from being admitted to prove a defendant's character in order to show action in conformity

with her character.  Fed. R. Evid. 404(b).  However, such evidence may be admitted for other purposes, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.  *Id.* With respect to intent, we have authorized admission of evidence of similar frauds committed by a defendant to show that she had the intent to commit the fraud charged in an indictment.  *See United States v. Brown*, 665 F.3d 1239, 1242-43, 1248 (11th Cir. 2011) (holding that evidence of the defendant's involvement in two prior bank fraud schemes was admissible to show his fraudulent intent and absence of mistake in committing the charged fraud scheme).  A defendant places her intent at issue by pleading not guilty.  *See United States v. Edouard*, 485 F.3d 1324, 1345 (11th Cir. 2007).

Evidence of criminal activity other than the charged offense is not subject to Rule 404(b) if it is: (1) evidence of an uncharged offense which arose out of the same transaction or series of transactions as the charged offense; (2) evidence that is necessary to complete the story of the crime; or (3) evidence that is inextricably intertwined with evidence regarding the charged offense.  *United States v. Ford*, 784 F.3d 1386, 1393 (11th Cir. 2015).  Evidence concerning uncharged conduct is intrinsic evidence when the uncharged conduct was part of the same scheme or series of transactions as the charged offense and used the same *modus operandi*. *Id.* at 1394.  Evidence is inextricably intertwined with the evidence of the charged

14

offense when "it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted." *Edouard*, 485 F.3d at 1344 (quotation marks omitted).

Whether offered under Rule 404(b) or as intrinsic evidence, the district court must find that the probative value of the proffered evidence is not substantially outweighed by unfair prejudice and that it meets the other requirements of Rule 403. *Ford*, 784 F.3d at 1393. Evidence is excludable if its probative value is substantially outweighed by a danger of unfair prejudice. *See* Fed. R. Evid. 403.

The district court did not abuse its discretion by ruling that evidence of Prince's 2010 state guilty plea to Medicaid fraud and subsequent sentencing as a first-time offender was admissible as evidence of her resulting exclusion from federal health care programs in 2011. The district court correctly determined that the evidence was intrinsic, as Prince used a similar *modus operandi* to accomplish her fraud, even though she used a company incorporated under her brother's name to conceal it. *See Ford*, 784 F.3d at 1393-94. Importantly, her exclusion from federal health care programs as a result of her state conviction explained why she backdated claims and used The Eye Gallery, instead of Pickens Eye Clinic, to submit the instant fraudulent claims.

In addition, evidence of her state guilty plea and restitution obligation, alongside her lump sum payments of restitution, showed her intent and motive for

15

committing the instant fraud.  Therefore, Prince's state conviction was necessary to complete the story of her crime.  *See id.*  Furthermore, the district court correctly concluded that, in the alternative, the evidence was admissible under Rule 404(b) as evidence of Prince's intent, identity, knowledge, lack of accident, and absence of mistake.  *See* Fed. R. Evid. 404(b).  As in *Brown*, evidence of Prince's guilty plea, first-offender sentence, and resulting exclusion from Medicare and Medicaid showed her fraudulent intent and absence of mistake in committing the charged offenses under the cover of the new company, The Eye Gallery, and in her brother's name.  *See Brown*, 665 F.3d at 1242-43, 1248.

Finally, the probative value of the evidence was not substantially outweighed by the risk of undue prejudice.  *See* Fed. R. Evid. 403.  First, Prince placed her knowledge and intent at issue by pleading not guilty.  *Edouard*, 485 F.3d at 1345.  The government was required to rely on probative circumstantial evidence of her intent to commit fraud, given the lack of direct evidence of her intent.  *Id.*  Her argument that the government did not need to show she pleaded guilty to show that she owed restitution has merit.  However, as mentioned above, the government entered into evidence the state criminal judgment for multiple reasons, including to show why the claims were linked to The Eye Gallery and her brother, and to prove that the claims were backdated.  *See Ford*, 784 F.3d at 1393-94.  Therefore, the district court did not abuse its discretion when it concluded that

the probative value of the state court judgment evidence was not substantially

outweighed by the risk of undue prejudice. *See* Fed. R. Evid. 403.

The district court also limited the prejudicial effect of the evidence by giving

a limiting instruction before the evidence was first presented and again in the jury

charge.  Thus, the district court acted within its discretion when it declined to

exclude the evidence of Prince's state conviction and sentence.  *See Crabtree*, 878

F.3d at 1287.

## C. Sufficiency of the Evidence

We review de novo whether sufficient evidence supports a conviction,

drawing all reasonable factual inferences from the evidence in favor of the verdict.

*United States v. Beckles*, 565 F.3d 832, 840 (11th Cir. 2009).  We assume that the

jury made all credibility choices in support of the verdict.  *United States v.

Thompson*, 473 F.3d 1137, 1142 (11th Cir. 2006).  Evidence is sufficient if a

reasonable trier of fact could find that it established guilt beyond a reasonable

doubt.  *Beckles*, 565 F.3d at 840.  In rebutting the government's evidence, a

defendant must do more than put forth a reasonable hypothesis of innocence,

because the issue is whether a reasonable jury could have convicted, not whether a

conviction was the only reasonable result.  *Id.* at 840-41.

To support a conviction for health care fraud under 18 U.S.C. § 1347, the

government must prove that the defendant: (1) knowingly and willfully executed,

17

or attempted to execute, a scheme to (2) defraud a health care program or to obtain by false or fraudulent pretenses money or property under the custody or control of a health care program, (3) "in connection with the delivery of or payment for health care benefits, items, or services."  18 U.S.C. § 1347.  The government must show that the defendant knew that the submitted claims were false.  *United States v. Medina*, 485 F.3d 1291, 1297 (11th Cir. 2007).  In a mail fraud case, we explained that knowingly making false representations is one way in which a person may execute a scheme to defraud.  *United States v. Scott*, 701 F.2d 1340, 1343-44 (11th Cir. 1983).  In another mail fraud case, we explained that to prove that a defendant intentionally executed a scheme to defraud, the government must prove that she had the specific intent to defraud.  *United States v. Suba*, 132 F.3d 662, 675 (11th Cir. 1998).  However, the government may rely on circumstantial evidence to establish specific intent.  *Id.*

In challenging whether sufficient evidence supported her convictions as to Counts 2 through 4 involving Morton, Prince appears to challenge only whether the claims described in those counts were false or fraudulent.  Although Morton testified at trial that he could not be sure that he did not receive a punctum plug, and Dr. Llabres, who allegedly had performed the procedure, did not testify, there was sufficient evidence for a jury to find Prince guilty of health care fraud for the counts involving Morton.  *See Williams*, 527 F.3d at 1244.  The circumstantial

18

evidence supported that Morton, like the other patients at the Summerville Housing Authority apartment, did not receive the punctum plug procedure billed by Prince. *See Beckles*, 565 F.3d at 840.  The evidence was uncontested that Prince billed for a punctum plug procedure performed on Morton.  Meanwhile, Morton testified that he had only seen Prince twice, having an eye exam and receiving eye drops on the first visit and only picking up glasses on the second.  He testified that he was "blown away" by the Medicare and Medicaid benefits statement claiming he had received the punctum plug procedure.

Sanders testified that she was there on the same day that Morton received an eye exam and also received a benefits statement stating she had received the punctum plug procedure, even though she did not receive the procedure or see anyone who did.  Thus, Morton's testimony that he was surprised by the punctum plug claim and Sanders's testimony that no one received the punctum plug procedure on the day she and Morton received their eye exams supports an inference that Morton did not receive the punctum plug procedure.

Furthermore, Dr. Bonds testified that the procedure could not be performed at a community center.  She testified that she was at the community center on the same day Morton allegedly received the procedure, did not perform the procedure or see anyone perform the procedure, did not see the necessary equipment for the procedure, and Prince was not qualified to perform the procedure.  As reflected in

19

the testimony of Davis, Hightower, and Romine, Prince's billing Medicare for services she did not perform for Morton and Sanders was consistent with her practice of billing services she did not provide to the Calhoun Gardens residents that same summer.  Thus, the trial testimony established Prince's pattern of fraudulent billing.

Prince's pattern of fraudulent billing alone was arguably insufficient to support an inference that she submitted false claims as to Morton.  However, taken together with Sanders's and Morton's testimony also supporting an inference that Prince never performed the procedure during her visit to the Summerville Housing Authority apartment, the evidence was sufficient to support an inference that Morton, like Sanders, Davis, Hightower, and Romine, never received the punctum plug procedure on the date billed.

Accordingly, based on the testimony of Sanders, Morton, Dr. Bond, Jones, Davis, Hightower, and Romine, a reasonable factfinder could infer that Dr. Llabres never performed the procedure on Morton that was billed to Medicare, even though Morton was unsure whether the procedure was performed on him and Dr. Llabres did not testify.

Finding no merit in the arguments presented, we affirm the convictions and sentences.

**AFFIRMED.**